RECORD NO. 19-4085

In The

# United States Court of Appeals
### For The Fourth Circuit

## UNITED STATES OF AMERICA,

*Plaintiff – Appellee*,

**v.**

## KYLE STEPHEN THOMPSON,

*Defendant – Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
AT GREENBELT

———————————

BRIEF OF APPELLANT

———————————

Stephen B. Mercer
RAQUINMERCER LLC
5906 Hubbard Drive
Rockville, Maryland 20852
(301) 880-9250

*Counsel for Appellant*

THE LEX GROUP ♦ 1108 East Main Street ♦ Suite 1400 ♦ Richmond, VA 23219
(804) 644-4419 ♦ (800) 856-4419 ♦ Fax: (804) 644-3660 ♦ www.thelexgroup.com

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. iii

STATEMENT OF JURISDICTION ...................................................... 1

STATEMENT OF THE ISSUES ........................................................... 1

STATEMENT OF THE CASE ............................................................... 2

    1.    Procedural History ................................................................. 2

    2.    Statement Of Pertinent Facts ................................................. 4

        A.    The Evidence At Trial .................................................. 4

    3.    Rulings Presented For Review ................................................ 5

        A.    The Lower Court's Instruction On The Elements Of The Offense ......................................................................... 5

        B.    The Trial Court's *Franks* Ruling ................................. 6

        C.    The Trial Court's *Leon* Good Faith Ruling ................ 6

SUMMARY OF THE ARGUMENT ....................................................... 9

ARGUMENT ........................................................................................ 10

    1.    The Court Provided An Inadequate Instruction On An Issue Central To The Crimes Charged ........................................... 10

        A.    Standard Of Review ..................................................... 10

        B.    The Jury Was Misinformed About The *Mens Rea* Element ....................................................................... 10

2.    The Court Erred In Refusing To Give Thompson's Theory Of Defense Instruction .............................................................. 21

    A.    Standard Of Review ................................................ 21

    B.    Thompson's Theory Of Defense Instruction .......................... 21

3.    The Court Below Misconstrued And Misapplied The Standard For Reckless Disregard When It Denied Thompsons' Motion To Suppress Under *Franks* ......................................................... 24

    A.    Standard Of Review ................................................ 24

    B.    The *Franks* Hearing ................................................ 24

    C.    The Investigation Of Thompson Begins ................................ 26

    D.    Not Enough For A Search Warrant ..................................... 28

    E.    Sergeant Tompkins Adds Information Late To The Affidavit .............................................................. 30

    F.    Sergeant Tompkins Switches The Affiants .............................. 31

    G.    The Standard For Reckless Disregard .................................. 32

4.    The Lower Court Misapplied *Leon* Good Faith ................................ 36

CONCLUSION ................................................................... 38

REQUEST FOR ORAL ARGUMENT ................................................... 39

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Brown v. Gardner*,
 513 U.S. 115 (1994) ................................................................. 14

*Forest v. Pawtucket Police Dept.*,
 377 F.3d 52 (1st Cir. 2004) ....................................................... 34

*Franks v. Delaware*,
 438 U.S. 154 (1978) ......................................................... *passim*

*Illinois v. Gates*,
 462 U.S. 213 (1983) ................................................................... 7

*Manokey v. Waters*,
 390 F.3d 767 (4th Cir. 2004) ................................................... 17

*Miller v. Prince George's County*,
 475 F.3d 621 (4th Cir. 2007) ................................................... 34

*Mortenson v United States*,
 322 U.S. 369 (1944) ................................................................. 15

*Noel v. Artson*,
 641 F.3d 580 (4th Cir. 2011) ................................................... 21

*Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*,
 469 U.S. 189 (1985) ................................................................. 14

*Reno v. Koray*,
 515 U.S. 50 (1995) ................................................................... 14

*States v. Lebowitz*,
 676 F.3d 1000 (11th Cir. 2012) ............................................... 11

*United States v. Bailey*,
    444 U.S. 394 (1980) ................................................................. 16

*United States v. Bonner*,
    648 F.3d 209 (4th Cir. 2011) ................................................. 38

*United States v. Clapp*,
    46 F.3d 795 (8th Cir. 1995) ................................................... 34

*United States v. Cobb*,
    905 F.2d 784 (4th Cir. 1990) ................................................. 10

*United States v. Cox*,
    744 F.3d 305 (4th Cir. 2014) ................................................. 11

*United States v. Crandon*,
    173 F.3d 122 (3d Cir. 1999) ................................................... 17

*United States v. Fowler*,
    932 F.2d 306 (4th Cir. 1991) ................................................. 22

*United States v. Kivanc*,
    714 F.3d 782 (4th Cir. 2013) ................................................. 10

*United States v. Leon*,
    468 U.S. 897 (1984) ...................................................... 8, 36, 37

*United States v. Lewis*,
    53 F.3d 29 (4th Cir. 1995) ..................................................... 22

*United States v. McFadden*,
    823 F.3d 217 (4th Cir. 2016) ................................................. 23

*United States v. McKenzie-Gude*,
    671 F.3d 452 (4th Cir. 2011) ................................................. 37

*United States v. Menasche*,
    348 U.S. 528 (1955) ............................................................... 14

*United States v. Morales-de Jesus*,
    372 F.3d 6 (1st Cir. 2004) ............................................................. 11

*United States v. Moye*,
    454 F.3d 390 (4th Cir. 2006) ......................................................... 10

*United States v. Palomino-Coronado*,
    805 F.3d 127 (4th Cir. 2015) ........................................... 10, 17, 39

*United States v. Pierson*,
    544 F.3d 933 (8th Cir. 2008) ......................................................... 11

*United States v. Raplinger*,
    555 F.3d 687 (8th Cir. 2009) ......................................................... 11

*United States v. Rusher*,
    966 F.2d 868 (4th Cir. 1992) ......................................................... 24

*United States v. Sirois*,
    87 F.3d 34 (2d Cir. 1996) .............................................................. 11

*United States v. Suarez*,
    906 F.3d 977 (4th Cir. 1990) ........................................................... 7

*United States v. Torres*,
    894 F.3d 305 (D.C. Cir. 2018) ................................................ 11, 15

*United States v. Vang*,
    128 F.3d 1069 (7th Cir. 1997) ...................................................... 15

*United States v. Williams*,
    548 F.3d 311 (4th Cir. 2008) ......................................................... 37

*United States v. Williams*,
    836 F.3d 1 (D.C. Cir. 2016) ........................................................... 21

*Waddington v. Sarausad*,
    555 U.S. 179 (2009) ...................................................................... 11

*West v. State*,
    137 Md. App. 314 (2001) ............................................................. 36

*Wilson v. Russo*,
    212 F.3d 781 (3d Cir. 2000) ....................................................... 34

**CONSTITUTIONAL PROVISION**

U.S. CONST. amend. IV ................................................................... 33

**STATUTES**

18 U.S.C. § 2251(a) ............................................................... *passim*

18 U.S.C. § 3231 ............................................................................. 1

18 U.S.C. § 3500 .......................................................................... 25

28 U.S.C. § 1291 ............................................................................. 1

**RULES**

FED. R. CRIM. P. 30(d) ..................................................................... 5

**SENTENCING GUIDELINE**

U.S.S.G. § 2G2.2(c)(1) ................................................................. 17

**OTHER AUTHORITIES**

Pub. L. No. 61-277, 36 Stat. 825 (1910),
    *codified as amended at* 18 U.S.C. §§ 2421-2424 ....................... 15

S. Rep. 95-438, 1978 U.S.C.C.A.N. 40 ....................................... 16

**UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | NO. 19-4085 |
| **Plaintiff - Appellee** | : | |
| vs. | : | (8:17-cr-00195-TDC-1) |
| | : | |
| **KYLE STEPHEN THOMPSON** | : | |
| | : | |
| **Defendant - Appellant** | : | |

**STATEMENT OF JURISDICTION**

Kyle Stephen Thompson appeals his judgment of conviction in a criminal case from the United States District Court for the District of Maryland in Greenbelt. The district court entered judgment on February 4, 2019, and Thompson filed a timely notice of appeal on February 4, 2019. The district court had subject matter jurisdiction under 18 U.S.C. § 3231. This Court has jurisdiction under 28 U.S.C. § 1291.

**STATEMENT OF THE ISSUES**

1.     Whether the district court adequately instructed the jury on the meaning of "*for the purpose of*" producing a visual depiction of that conduct?

2.     Whether the district court correctly denied Thompson's challenge to the search warrant under *Franks v. Delaware*?

3.     Whether, in light of the district court's findings following the *Franks* hearing, the court below correctly sustained its original decision that the affiant

1

objectively relied in good faith on the issuing judge's determination of probable cause?

## STATEMENT OF THE CASE

### 1.    Procedural History

On April 5, 2017, a federal grand jury for the District of Maryland returned an indictment charging Thompson with 18 counts of Production of Child Pornography, in violation of 18 U.S.C. § 2251(a). (JA 16). The 18 counts were based on videos recorded between May 9, 2015, and January 28, 2017, of Thompson engaging in sexually explicit conduct with three young girls, O, S, and C.[1] (JA 754). The videos had been seized during the execution of a state court search warrant on March 17, 2017, at Thompson's residence located at 14215 Ballinger Terrace, Burtonsville, Montgomery County, Maryland. ("Ballinger Terrace"). (JA 113). Thompson moved to suppress the videos, because *inter alia* the search warrant affidavit failed to establish a nexus between the items to be seized and the place to be searched or provide an adequate basis for the issuing judge to independently assess the reliability of the source of information, Individual 1.[2]  (JA 36).

---

[1] In the indictment, these designations were used: Victim 1 = O. Victim 2 = S. Victim 3 = C. These designations are used in Thompson's brief and the joint appendix. O's older half-sister is referred to as Victim A.

[2] For clarity, the "anonymous source" in the search warrant affidavit is referred to as "Individual 1" because she identified herself to law enforcement but requested to remain anonymous.

The district court, (the Honorable United States District Court Judge Theodore D. Chuang, presiding) agreed that the affidavit did not provide a sufficient nexus but concluded nonetheless under *United States v. Leon*, 468 U.S. 897, 923 (1984), that the affiant, Sergeant Monique Tompkins, relied in good faith on the issuing judge's determination of probable cause. (JA 36). Subsequently, Thompson requested a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978). (JA 123). The court below granted Thompson's request for a *Franks* hearing, (JA 123) received the testimony of Sergeant Tompkins, and concluded that she did not intend to mislead the issuing judge. (JA 268). In light of its *Franks* ruling, the lower court revisited its *Leon* good faith ruling, and sustained it.  (JA 268).

The case proceeded to a jury trial from September 11th to 13th, 2019. At the close of the government's case in chief, Thompson moved for judgment of acquittal on the grounds that the evidence of "purpose" necessary to sustain a conviction under 18 U.S.C. § 2251(a) was insufficient. (JA 616). The court below denied Thompson's motion for judgment, (JA 619) and his subsequent request for a jury instruction on his theory of defense. (JA 652-654). The jury convicted Thompson on each count of production of child pornography. (JA 692). On January 30, 2019, the court below

sentenced Thompson to a total of 5,040 months of imprisonment.[3] Thompson timely filed a notice of appeal on February 4, 2019.

## 2.    Statement Of Pertinent Facts

### A.    *The Evidence At Trial*

The search warrant for Ballinger Terrace was executed around 1:30 p.m. on March 17, 2017. (JA 252). Thompson had already been arrested at his place of work around 11:30 a.m. (JA 263). During the execution of the search warrant, officers recovered a video camera, tripod, and laptop computer from Thompson's basement room. (JA 367). Officers also recovered a Quickie Clean and Fresh can that looked like a regular can of household cleaner but had a false bottom on it and was hollow. (JA 384). Inside that can was a memory card and several thumb drives. (JA 385).

The memory card recovered from the Quickie Clean and Fresh can contained the key video evidence recorded with the recovered video camera. (JA 658; 671). Nineteen of the seized videos were admitted at trial. Sixteen of the videos depicted

---

[3] On April 13, 2017, the grand jury for the circuit court of Montgomery County returned an indictment charging Thompson with 78 counts of sex abuse of a minor and related sex offenses depicted in the videos. *State v. Kyle Stephen Thompson*, case number 131547C (circuit court for Montgomery County, Maryland). Following his federal trial in the case at hand, Thompson entered a conditional guilty plea in state court to ten counts of the indictment, preserving his right to appeal the denial of his motions to suppress the March 17, 2017, search warrant. On March 8, 2019, the state court sentenced Thompson to three consecutive life terms plus 145 years, consecutive to his federal sentence. Thompson's appeal is pending before the Maryland Court of Special Appeals, CSA-REG-0198-2019 and has been set for argument in the January 2020 session.

Thompson engaging in sexually explicit conduct with a young girl O. (JA 754). The three remaining videos depicted Thompson engaging in sexually explicit conduct with S and C. (JA 754). Additional facts are set forth as necessary to the argument below.

## 3. Rulings Presented For Review

### A. *The Lower Court's Instruction On The Elements Of The Offense*

The court below instructed the jury on the elements of production of child pornography. (JA 621; 646). In pertinent part, the court stated:

> The second element which the government must prove beyond a reasonable doubt is that the defendant knowingly used or employed or persuaded or induced or enticed or coerced the victim, Victim 1, 2 or 3 as charged to engage in sexually-explicit conduct for the purpose of producing a visual depiction of that conduct. ... The government does not have to prove that the sole purpose or the primary purpose of engaging in such conduct was to produce a visual depiction. But the government must prove that producing a visual depiction of the sexually-explicit conduct was one of the defendant's purposes for using, employing, persuading, using, enticing, coercing the victim to engage in sexually-explicit conduct. And that it was a significant or motivating purpose and was not merely incidental to the sexually-explicit conduct.

(JA 696). Thompson objected, pursuant to Fed. Rule Crim. Proc. 30(d), to the court's instruction because it failed to state the law correctly, but even if it did, the instruction did not adequately explain to the jury the meaning of "for the purpose of producing a visual depiction" of sexually explicit conduct. (JA 646). The court

5

below rejected Thompson's proposed instruction to resolve the ambiguity in the instruction given.

### B.   *The Trial Court's Franks Ruling*

Subsequent to the trial court's ruling that Sergeant Tompkins relied in good faith on the issuing judge's probable cause determination, Thompson requested a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978). (JA 123). Thompson argued Sergeant Tompkins mislead the issuing judge about her acquisition of information from Individual 1 and added a collection of statements to the affidavit that falsely attributed knowledge to Individual 1 to bolster her reliability as the source of information.  On September 6, 2018, the lower court granted Thompson's request for a *Franks* hearing. Sergeant Tompkins testified about her role in the investigation and her attribution of statements to Individual 1. (JA 175).

In light of Sergeant Tompkins' testimony, the defense requested the opportunity to examine Detective Avelar to contradict or confirm Sergeant Tompkins' attribution of statements to Individual 1 and her role in the seven-minute phone call with Individual 1 on March 16, 2017. (JA 275-78). The lower court denied Thompson's request to call Detective Avelar because it found Sergeant Thompkins' affidavit did not contain a material misstatement or intentional falsehood. (JA 283-85). The lower court also denied Thompson's motion to suppress under *Franks* because it found that the issuing judge was "not mislead by information in the

6

affidavit that [Sergeant Tompkins] knew was false or would have known was false except for her reckless disregard of the truth." (JA 291).

### C.    *The Trial Court's Leon Good Faith Ruling*

Thompson challenged the sufficiency of the probable cause contained within the four-corners of Sergeant Tompkins' affidavit because, in pertinent part, it failed to establish a nexus between Ballinger Terrace and the items to be seized pursuant to the warrant or provide the issuing judge with sufficient facts to evaluate the reliability of the "anonymous source" of information. (JA 40). Thompson further maintained that Sergeant Tompkins did not rely in good faith on Judge Rubin's probable cause determination because a reasonable officer would recognize that the affidavit contained insufficient details for the issuing judge to independently evaluate the reliability of the source of information. (JA 93-94).

Following a hearing on November 17, 2017, (JA 36), the court below determined that, even under the deferential standard set forth in *Illinois v. Gates*, 462 U.S. 213 (1983) and *United States v. Suarez*, 906 F.3d 977 (4th Cir. 1990), it could not readily find within the four-corners of Sergeant Tompkins' affidavit a sufficient nexus between Ballinger Terrace and the items to be seized pursuant to the warrant. (JA 99-101). On the question of Sergeant Tompkins' good faith reliance, the government did not present evidence that uncontroverted facts had been inadvertently omitted from the March 17th affidavit. *See*, *e.g.*, *United States v.*

7

*McKenzie-Gude*, 671 F.3d 452, 462 (4th Cir. 2011). (JA 90-91). The lower court upheld the warrant because it concluded the circumstances set forth in Sergeant Tompkins' affidavit showed that she objectively and in good faith relied on the issuing judge's probable cause determination. (JA 98-99). *Leon*, 468 U.S. at 923. The court below revisited and sustained its *Leon* good faith ruling after it made findings about the veracity of Sergeant Tompkins' statements in its *Franks* ruling. (JA 291-92).

## SUMMARY OF THE ARGUMENT

The Court must confront in this case horrific acts of sexual abuse of very young children. The creation of the graphic images was not, however, the motivating purpose of Thompson's serial acts of sexual abuse of these children. Those crimes are not within the purview of this federal prosecution for the production of child pornography. The crime under § 2251(a) is to coerce children to engage in sexually explicit conduct "*for the purpose of*" producing a visual depiction. Section 2251(a) covers a broad category of sexually explicit conduct but its specific purpose does not reach sexual abuse whenever there is a visual depiction of such conduct. For precisely this reason, the trial court has a vital role to adequately instruct the jury on the meaning of "*for the purpose of*" to ensure a defendant, like Thompson, who disputes no other element, has a fair opportunity to present his defense. That opportunity did not occur at the trial below, because the court's

8

instruction on the purpose element inadequately explained the law and likely confused the jury. Moreover, the court below refused to provide Thompson's proposed instruction that was his only medium for a defense.

The court below also erred in its application of the reckless disregard standard under *Franks* after hearing the testimony of the affiant, Sergeant Tompkins. When Sergeant Tompkins believed the affidavit lacked probable cause, she added a collection of statements attributed to Individual 1 to bolster Individual 1's reliability with personal knowledge of Victim A's prior report of abuse. Similarly, the lower court erred in its conclusion that Sergeant Tompkins objectively and in good faith relied on the issuing judge's determination of probable cause for the search warrant of Thompson's residence. Sergeant Tompkins made numerous edits to the affidavit, which deprived the issuing judge of the opportunity to independently assess the basis for the Sergeant's conclusions. There was no evidence offered that Sergeant Tompkins inadvertently left uncontroverted facts out of her affidavit.

## ARGUMENT

**1.    The Court Provided An Inadequate Instruction On An Issue Central To The Crimes Charged**

### A.    *Standard of Review*

This Court reviews a district court's jury instructions decision for an abuse of discretion. *United States v. Moye*, <u>454 F.3d 390, 398</u> (4th Cir. 2006) (*en banc*). The Court reviews a jury instruction to determine "whether, taken as a whole, the instruction fairly states the controlling law." *United States v. Cobb*, <u>905 F.2d 784, 789</u> (4th Cir. 1990); *United States v. Kivanc*, <u>714 F.3d 782, 794</u> (4th Cir. 2013) (Court considers "whether the instructions construed as a whole, and in light of the whole record, adequately informed the jury of the controlling legal principles without misleading or confusing the jury to the prejudice of the objecting party.").

### B.    *The Jury Was Misinformed About The Mens Rea Element*

Section 2251(a) creates an offense when the defendant "employs, uses, persuades, induces, entices, or coerces any minor, ... with the intent that such minor engage in, any sexually explicit conduct for the purpose of producing any visual depiction of such conduct...." *Id.*  To be guilty of producing child pornography, "a defendant must engage in the sexual activity with the specific intent to produce a visual depiction; it is not sufficient simply to prove that the defendant purposefully took a picture." *United States v. Palomino-Coronado*, <u>805 F.3d 127, 131-32</u> (4th Cir. 2015) (finding insufficient evidence "that Palomino–Coronado engaged in sexual

activity with B.H. *to* take a picture, only that he engaged in sexual activity with B.H. *and* took a picture"). Congress "very well could have criminalized the conscious production of child pornography, but it did not, at least not in § 2251(a)." *United States v. Torres*, 894 F.3d 305, 321 (D.C. Cir. 2018). To hold otherwise would allow proof by *ipse dixit*—that the image "speaks for itself *and* for the defendant, and that is the end of the matter." *States v. Lebowitz*, 676 F.3d 1000, 1013 (11th Cir. 2012).

To be sure, courts do not interpret § 2251 to require that a defendant be single-minded in his purpose. *Id.* at 1013; *United States v. Morales-de Jesus*, 372 F.3d 6, 21-22 (1st Cir. 2004); *United States v. Cox*, 744 F.3d 305, 309 (4th Cir. 2014) ("purpose" in context of sentencing guidelines governing production of some child pornography offenses). While courts have said that § 2251 does not require the government to prove a defendant engaged in the illegal sexual activity with the sole or dominant purpose to produce child pornography, they have qualified that the evidence must also show the purpose to be "one of the dominant motives and not a mere incident" to the activity. *United States v. Sirois*, 87 F.3d 34, 39 (2d Cir. 1996); *United States v. Raplinger*, 555 F.3d 687 (8th Cir. 2009); *United States v. Pierson*, 544 F.3d 933 (8th Cir. 2008). However, in attempting to explain this controlling legal standard to the jury, the court below gave an instruction that likely confused the jury to the prejudice of Thompson's sole theory of defense. *Waddington v. Sarausad*, 555 U.S. 179, 190-91 (2009) (instruction is ambiguous and violates Due

11

Process Clause when it is "reasonably likely" to be understood by the jury to relieve the government's burden to prove all elements of an offense violates the Due Process Clause).

Here, the instruction of the controlling legal principle at the center of Thompson's defense, *i.e.*, "for the purpose of producing a visual depiction" did not fairly state the law or adequately inform the jury of the controlling legal principles without misleading or confusing them. The second element of the lower court's instruction to the jury is at issue:

> I will now instruct you on the elements of the crime of production of child pornography; that is, the specific things that the government must prove in order to establish the defendant's guilt. For any particular count, the government must prove each of the following elements beyond a reasonable doubt. First, that the victim, Victim 1, 2 or 3 as charged was under the age of 18. Second, that the defendant knowingly used or employed or persuaded or induced or enticed or coerced the victim, Victim 1, 2 or 3 as charged to engage in sexually-explicit conduct for the purpose of producing a visual depiction of that conduct. And third, that the visual depiction was produced using materials that had been mailed, shipped or transported in interstate or foreign commerce by any means including by computer.
>
> ...
>
> The second element which the government must prove beyond a reasonable doubt is that the defendant knowingly used or employed or persuaded or induced or enticed or coerced the victim, Victim 1, 2 or 3 as charged to engage in sexually-explicit conduct for the purpose of producing a visual depiction of that conduct. A visual depiction includes any photograph, film, video or picture including undeveloped film or videotape or data stored on computer disc or by electronic means, which is capable of conversion into the visual image. The government does not have to prove that the sole purpose or the primary

12

> purpose of engaging in such conduct was to produce a visual depiction. But the government must prove that producing a visual depiction of the sexually-explicit conduct was one of the defendant's purposes for using, employing, persuading, using, enticing, coercing the victim to engage in sexually-explicit conduct. And that it was a significant or motivating purpose and was not merely incidental to the sexually-explicit conduct.
>
> ...

(JA 645-46); (JA 740) (written instruction). The instruction as given did not fairly state the law that the government must prove the production of a visual depiction was the motivating purpose to secure a conviction under 18 U.S.C. § 2251(a). Moreover, it likely confused the jury about the meaning of "for the purpose of" to the advantage of the government.

The lower court defined "for the purpose of" in both positive and negative ways that effectively cancelled each other out and reduced the government's burden of proof. The elements of the lower court's definition of engaging in sexually explicit conduct "for the purpose of" producing a visual depiction required the jury to understand and apply these elements:

1. The "purpose" can be one of many purposes;

2. The "purpose" does not have to be the primary purpose;

3. The "purpose" must be "significant" OR "motivating" AND

4. The "purpose" is "not incidental."

Prongs one and two are clear enough, but what does a reasonable juror understand a "significant or motivating" purpose to mean that cannot be "incidental"? Can a

13

motivating purpose also be insignificant? Does, "not incidental" mean there really is not a purpose at all, or just a minor purpose? Linking "motivating" purpose to "significant" purpose in an alternative way also lowers the bar. In any case, the "not incidental" element lowers the bar of a "significant or motivating" purpose below the level of proof Congress intended when it used the words "for the purpose of" in the statute. As long as the purpose is not "incidental" it qualifies.

Rules of statutory construction call for the reading of the statute as a whole. "Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194 (1985). "It is our duty 'to give effect, if possible, to every clause and word of a statute.'" *United States v. Menasche*, 348 U.S. 528, 538-539 (1955). As courts have repeatedly stated, "the meaning of statutory language, plain or not, depends on context." *Brown v. Gardner*, 513 U.S. 115, 118 (1994). Moreover, if the meaning of the standard "for the purpose of" is unclear, then the rule of lenity applies. *Reno v. Koray*, 515 U.S. 50, 65 (1995) (Rule of lenity applies when, "after seizing everything from which aid can be derived, ... we can make no more than a guess as to what Congress intended.") (internal citations omitted). Under the rule of lenity, any ambiguity must be resolved in Thompson's favor.

14

The § 2251(a) requirement that conduct is undertaken "'for the purpose of'
some aim has a long history in statutes of this kind." *Torres*, 894 F.3d at 321
(referencing the Mann Act). The Mann Act contains a similar provision. Pub. L. No.
61-277, 36 Stat. 825 (1910), *codified as amended at* 18 U.S.C. §§ 2421-2424.
Because the language of the Mann Act is similar to the language of the statute at
issue, its jurisprudential history is instructive. *See generally United States v. Vang*,
128 F.3d 1069 (7th Cir. 1997). In an early case involving that provision, *Mortenson*
*v. United States*, 322 U.S. 369 (1944), the Supreme Court stated that an intention to
transport women across state lines for the purpose engaging in the conduct outlawed
by the Act "... must be the *dominant* motive of such interstate movement." *Id.*
(emphasis added). In other words, intent to bring about illegal sexual conduct
through transportation was required before the Mann Act could have been violated.

The lengthy mandatory minimum indicates that Congress likely meant that,
to be guilty, a defendant must be found to have given the production of child
pornography the highest priority of the sexual conduct.  Indeed, as originally
enacted, Congress used the phrase "for the purpose of" so that § 2251(a) *could* target
producers of child pornography who employed, used, enticed, *etc.* any minor to
engage in "sexually explicit" (but not necessarily obscene) conduct:

> Section 2251(a) makes it a federal crime for any person knowingly to
> employ, use, persuade, induce, entice, or coerce any minor to engage
> in, or to have a minor assist any other person to engage in, any sexually
> explicit conduct, for the purpose of promoting any film, photograph,

15

negative, slide, book, magazine, or other print or visual medium, if such person knows or has reason to know that such film, photograph, negative, slide, book, magazine, or other print or visual medium will be mailed or otherwise transported in interstate or foreign commerce.

S. Rep. 95-438, 20, 1978 U.S.C.C.A.N. 40, 57.

> The proponents of s.1585 insist that the best way to put a prompt and effective end to the mischief is to make the production of child pornography a federal crime. Accordingly, the bill provides, under section 2251, that it shall be unlawful for anyone knowingly to persuade or force any minor to engage in "sexually explicit conduct" for the purpose of promoting any film, book, or magazine, if this person knows or has reason to know that such material will be mailed or otherwise transported in interstate or foreign commerce.

> The term "sexually explicit conduct" is the key to an understanding and appreciation of this legislation, because it extends beyond more obscenity, as defined by the supreme court, and includes every form of sexual behavior, whether actual or simulated. This bill, in other words, does not forbid simply the production of obscene materials, but all materials which portray the kinds of "sexually explicit conduct" that are proscribed under section 2251.

> With regard to the sale and distribution of these materials, however, s.1585 attacks the problem simply by increasing the penalties for the distribution of obscene materials where children are depicted. Thus the bill contains a double standard, one for the producers of child pornography ("sexually explicit conduct") and another for the distributors (obscenity as legally defined).

S. Rep. 95-438, 31, 1978 U.S.C.C.A.N. 40, 66. A statute that requires a *mens rea* of acting with a specific purpose contains the highest standard of intent in criminal law. *See, e.g.*, *United States v. Bailey*, 444 U.S. 394, 404 (1980) ("The different levels in this hierarchy are commonly identified, in descending order of culpability, as purpose, knowledge, recklessness, and negligence."). "In a general sense, 'purpose'

corresponds loosely with the common-law concept of specific intent." *Id*. A defendant who merely acts recklessly has not acted with specific intent or with the purpose proscribed by law. *See, e.g.*, *Manokey v. Waters*, 390 F.3d 767, 771 (4th Cir. 2004) ("[E]ach crime requires proof of a *mens rea* different from the *mens rea* of the other crime. Accordingly, "[a] defendant must engage in the sexual activity with the specific intent to produce a visual depiction; it is not sufficient simply to prove that the defendant purposefully took a picture." *Palomino-Coronado*, 805 F.3d at 131; *accord United States v. Crandon,* 173 F.3d 122, 129 (3rd Cir. 1999) (considering standard of proof for application of USSG § 2G2.2(c)(1)'s "for the purpose of" clause).

Here, the jury was misinformed about the require elements that the government had to prove regarding Thompson's purpose for coercing O, S, and C to engage in sexually explicit conduct. This allowed the government in its closing to make the circular argument that Thompson's conscious use of a video camera satisfied the government's burden of proof on the "purpose" element. The government argued "[t]he purpose of this camera in a very common sense basic factual way was to film videos of little girls engaged in sexual acts with the defendant." (JA 667). The government also told the jury that Thompson's use of the video camera and television was a means to divert, placate, and coerce the victims to engage in sexually explicit conduct. (JA 664-65). Further, that the "purpose" of

17

storing and concealing the videos was to keep these videos. (JA 670-71). The government rhetorically asked, "[w]ere these videos produced for the purpose of depicting this sexually explicit conduct? Absolutely." (JA 671). The government concluded, [t]he purpose of these sexual acts was to produce these videos. Was he aware? Yes. He knew what he was doing. He was doing it for the camera." (JA 672).

Thompson's theory of defense was not whether he created videos of himself engaging in sexually explicit conduct with O, S, and C. The sole question was whether the jury could reasonably have concluded that Thompson's motivating purpose for coercing O, S, and C to engage in sexually explicit conduct was the production of the videos. The defense argued:

> The purpose of Mr. Thompson is to engage in sexual activities and to see himself and to help the child engage in that activity along with him. And that is not a crime under this statute.

(JA 683). The defense directly addressed Thompson's *motivating* purpose:

> And that brings me to the real question here, which is what is Mr. Thompson's motivating purpose? What is his motivating purpose, his significant purpose when he is engaging in the sexual abuse of those children? And I just have to state the obvious. His motivating purpose is to abuse the kids. That's what he wants to do. He's not engaging in sexual activity for the purpose of producing videos. He's engaging in sexual activity because that's what he wants to do. I mean we've seen the acts on the videos. I mean it's the constant repeated diverse abuse for his own personal satisfaction. How perverted it is, it is his own personal gratification. That is clearly his primary goal. His primary purpose is the abuse of the children.
>
> And I'll summarize that in just one photo, which is Government's Exhibit 44. And it says it all in -- I don't need to explain it. It's him

18

touching the child looking at his image in the video with his tongue sticking out. His purpose is not to produce videos. His purpose is simply to abuse the kids and to complete the act.

The second purpose that Mr. Thompson has is to see himself and that brings me to the definition of visual depiction. Because a visual depiction again it is defined in Jury Instruction Number 32. I'll read it to you before you see it. It is any photo, film, video or picture including any undeveloped film and videotape and data stored on computer disc or by any other electronic means which is capable of conversion into a visual image. So in the definition of visual depiction, it is something that you can keep. It is something that you can store, something that you can have. A visual depiction is not having a live image on a T.V. screen that is contemporaneous and simultaneous to the abuse that the person is performing.

So the second motivating factor on Mr. Thompson when he is engaging in sexual activity of the abuse of the child is for him to see himself, to watch what he is doing and that is different from the actual production of -- actual image that you can keep. Remember what I was discussing earlier which is the only way for him to be able to display the image on the big screen TV is to have a memory card in the camera. And we can see that from the setup of the room? In the government's exhibits, we can see that the TV, that is a pretty big TV is right there. That in the videos that we have watched, Mr. Thompson is never looking straight at the camera. I mean the government just happened to take the one single shot that it showed you earlier when he's looking straight at the camera. He's always looking to the side because that's where the T.V. is actually depicting what is happening.

So the second -- the secondary purpose for Mr. Thompson when he's engaging is the sexual activity with the child is to see himself. He wants the enhanced version of himself, again as twisted as it can be, he wants to see himself on the T.V. and he wants to see different angles for the purpose of the sexual act and he wants to see himself and body parts and he wants to see sometimes the face of the children that he cannot see from the position that he is in. So that is the second purpose of this live image, which is not visually depiction. This is the secondary purpose of the television being present. He's looking at himself in the commission of these acts.

There is a third purpose also. There is a third purpose to Mr. Thompson's use of the T.V. which again has nothing to do with the production of the videos. His third purpose is that the video -- not the video -- the image on T.V. helps him complete the act. It helps him soothe the child. And as the government said in one of their slides in closing arguments, he's using the T.V. to divert and placate the children. And I could not agree more. He's using the T.V. not because he's recording and producing videos. He's using the T.V. as a way of distracting the children. He's also using the T.V. as a way to engage the children in the sexual act.

I mean again as horrible as this is, that's what the purpose of those images are. It's to engage the child, to groom the child, to make it easier for the child to engage in the sexual act. These are the purposes in this case.

(JA 679-82). Consistent with these purposes, the government's expert confirmed that

the forensic analysis of the video files did not indicate that the videos had been

edited.  (JA 678). Further, the government introduced no evidence of distribution; to

the contrary, the videos were hidden and concealed. (JA 678). In rebuttal, the

government argued:

First, the instruction that's on the screen is the instruction that tells you what purpose requires. Those are the Court's instructions and that is the law that you are to follow. Not what I argue, not what defense counsel argues. What the instruction says.

And what the instruction says is that the purpose of production does not have to be the sole or even the primary purpose. Just has to be one of the purposes. It has to be a motivating or significant factor. Of course, it was a motivating or significant factor in this case.

(JA 685). The government's emphasis on "motivating or significant factor"

underscores the likelihood of confusion caused by the lower court's inadequate and

20

misleading instruction. Analysis of the lower court's instruction on the "purpose" element in the context of this case demonstrates an error of magnitude that requires reversal. This error was compounded by the lower court's refusal to instruct the jury on Thompson's theory of defense.

## 2. The Court Erred In Refusing To Give Thompson's Theory Of Defense Instruction

### A. *Standard Of Review*

A district court will be reversed for declining to give a proposed jury instruction only when the requested instruction "(1) was correct; (2) was not substantially covered by the court's charge to the jury; and (3) dealt with some point in the trial so important, that failure to give the requested instruction seriously impaired that party's ability to make its case." *Noel v. Artson*, <u>641 F.3d 580, 586</u> (4th Cir. 2011) (quotation omitted).

### B. *Thompson's Theory Of Defense Instruction*

Thompson genuinely contested the element of "purpose" through his counsel's opening statement, cross-examination and closing argument. "An argument that a required element of a crime is missing is sometimes colloquially deemed a 'defense.'" *United States v. Williams*, <u>836 F.3d 1, 13</u> (D.C. Cir. 2016). That is the case here, where Thompson's "defense" was the lack of proof of his purpose. *See id*. Although Thompson's counsel was allowed to argue the lack of purpose to the jury it did not cure the court's deficient instruction nor provide a

21

substitute for a correct instruction. *See United States v. Lewis*, 53 F.3d 29, 34-35 (4th Cir. 1995) (rejecting "contention that assumes a defendant may be denied an otherwise proper instruction on the theory of his defense because he may argue that theory in closing argument"). Here, the government emphasized this precise point in its rebuttal argument when it directed the jury to a display of the court's instructions: "Those are the Court's instructions and that is the law that you are to follow. Not what I argue, *not what defense counsel argues*. What the instruction says." (JA 685) (emphasis supplied).

For this reason, in addition to correctly instructing on the elements of a charged offense, "a district court must instruct the jury on the law pertaining to the theory of defense." *United States v. Fowler*, 932 F.2d 306, 316 (4th Cir. 1991). Applying this test to the instruction requested by the defense, which defined the element of the § 2251(a) charges most critical to Thompson's defense, it is apparent that the district court abused its discretion in refusing to give the instruction, and that the court's error harmed Thompson. As indicated above, § 2251(a) punishes "[a]ny person who employs, uses, persuades, induces, entices, or coerces any minor to engage in . . . any sexually explicit conduct *for the purpose of producing* any visual depiction of such conduct . . . ." 18 U.S.C. § 2251(a) (emphasis added). To ensure the purpose element is true to the plain language of 18 U.S.C. § 2251(a) and the

history of how Congress has used "for the purpose of" to connote a specific intent,

Thompson proposed the following instruction be given:

> "For the purpose of" means that producing a visual depiction was Defendant's motivating purpose for using, employing, persuading, inducing, enticing, or coercing the victim to engage in sexually explicit conduct. The Government does not have to prove that Defendant's sole purpose for engaging in such conduct was to produce a visual depiction. But where there are two or more purposes to engage in such conduct, the Government must prove that Defendant's prevailing or most influential purpose was to produce a visual depiction of the sexually explicit conduct.

(JA 113). The court below abused its discretion when it declined to give Thompson's

requested instruction. (JA 697). The proposed instruction was correct; it was not

substantially covered by the court's instruction on the second element; and it dealt

with the central and disputed element in the trial. The court's failure to give the

requested instruction substantially undermined Thompson's ability to present his

defense and requires reversal. The failure to give the proposed instruction effectively

omitted an element of the offense, *mens rea*, an error of constitutional dimension.

*United States v. McFadden*, 823 F.3d 217, 224 (4th Cir. 2016).

3.   **The Court Below Misconstrued And Misapplied The Standard For Reckless Disregard When It Denied Thompson's Motion To Suppress Under *Franks***

A. *Standard Of Review*

In reviewing a district court's suppression order, this Court reviews the district court's factual findings for clear error, while its legal conclusions are reviewed *de novo. United States v. Rusher*, <u>966 F.2d 868, 873</u> (4th Cir. 1992).

B. *The Franks Hearing*

Thompson requested a hearing under *Franks v. Delaware*, <u>438 U.S. 154</u> (1978), to challenge the veracity of Sergeant Tompkins' statements in her March 17th affidavit that: (1) "[o]n March 16, 2017, *the writer* interviewed [Individual 1]." (JA 118); (2) Individual 1 said the abuse of Victim A happened "a few years prior"; (3) Individual 1 related that Victim A's mother lied to police and CPS about not knowing the suspect's full name or whereabouts; and (4) Individual 1 stated that Victim A disclosed that the abuse happened when her and her mother went to "Kyle's house" located at 14215 Ballinger Terrace."  (JA 119). These details—which were attributed to Individual 1—were central to Sergeant Tompkins' further assertion that she "conducted a check with Child Protective Services and other police agencies and *could corroborate the information given by the source regarding* [Victim A].  (JA 118).

Initially, the government maintained that Sergeant Tompkins had innocently conflated information from multiple sources to Individual 1 during the investigation.

24

(JA 136). However, the night before the *Franks* hearing, the government disclosed *Jencks* materials, *see* 18 U.S.C. § 3500, that showed the original author of the March 17th affidavit was not Sergeant Tompkins but Detective Melvin Avelar, and that Tompkins had changed the affiant to herself before presenting it to the state court judge. (JA 136). Further, the government argued that Sergeant Tompkins had interviewed Individual 1 as referenced in her affidavit and personally heard all of the details contained in the March 17th search warrant affidavit because she was present for a follow-up phone call on the evening of March 16th with Individual 1.  (JA 126; 133; 137).

The court below decided to hear from Sergeant Tompkins, explaining that:

> So to the extent that these facts may have been attributed to the anonymous source may overall have served to bolster the level of detail and level of information of this source and may have also, therefore, in the state judge's mind put forth a more convincing case that the anonymous source was fully aware of many, many details that would allow that source to be deemed reliable.  So I can't find that these statements were all not necessary to the ruling, not the underlying statements, but the level of detail that the anonymous source was attributed -- that was attributed to the anonymous source.

> So I do think given where we are in the case now, the most prudent thing to do is to hear from Sergeant Tompkins. This is going to be a limited proceeding because as I stated, the real issue here is not who did the interviews, although that may come up in the hearing. It's not who -- whether all these underlying facts are true or not. It's just what level of detail is coming from the anonymous source, whether some of these were actually mistakes that were unintentional. I would like to hear from Sergeant Tompkins on those issues.

(JA 174-75).  Sergeant Tompkins testified as follows.

## C. *The Investigation Of Thompson Begins*

Around 5:00 p.m. on Thursday, March 16, 2017, an email from FBI Special Agent Jacqueline Dougher was forwarded to Sergeant Monique Tompkins. (JA 185). Sergeant Tompkins worked in the Child Abuse Unit where she oversaw seven detectives. (JA 180-81). Sergeant Tompkins had worked for the Montgomery County Police Department for 26 years and had submitted over 100 search warrants. (JA 182). Agent Dougher's email contained a summary of information from Individual 1 about how she came to watch videos that depicted Thompson sexually exploiting minors. (JA 188). Agent Dougher's email included the name, date of birth, address, email, cell phone number, and occupation of Individual 1. (JA 187). The email also included the names and social security numbers of possible victims and their mother. (JA 187). The email also identified an additional child of the same mother, Victim A,[4] who may have made an allegation of abuse by Thompson in the past that resulted in a Child Protective Services ("CPS") investigation in Baltimore County. Before receiving Agent Dougher's email, Sergeant Tompkins had no information about Thompson. (JA 190).

Around 7:00 p.m., Sergeant Thompkins assigned the case to Detective Melvin Avelar for investigation. (JA 191; 228). Sergeant Tompkins testified that all seven

---

[4] Victim A = Child 2 or Victim 2 in the March 17th affidavit. Victim A is not the Victim 2 identified in the indictment.

detectives in her unit were working late that evening on the Thompson investigation and reporting back to her with updates. (JA 231). She confirmed that the Ballinger Terrace address was Thompson's residence from multiple sources. (JA 209). Michelle Sears with Child Protective Services and Detective Avelar called Individual 1 on a recorded line. (JA 192). Their call lasted about 30 minutes. (JA 233). Sergeant Tompkins was not present for their interview of Individual 1. (JA 194). After the interview, Detective Avelar and Michelle Sears debriefed Sergeant Thompkins. (JA 245).

Sergeant Thompkins requested that Sears obtain the CPS report from Baltimore County regarding Victim A's previous disclosure of abuse. (JA 195). The report included a short synopsis of Victim A's disclosure that she went to her mother's boyfriend's house a few years ago and that he put his hands down her pants. (JA 197). Sears also obtained a more detailed CPS assessment that identified Victim A, her mother, and a two-year-old half-sister with the same name as provided by Individual 1 to be Thompson's daughter. (JA 198).  Victim A called her mother's boyfriend "Kyle." (JA 199). The mother reported to CPS that "Kyle" denied the allegations made by the child but that she did not know his full name or home address.  (JA 199). A Baltimore County Police Department Report was also obtained that cross-referenced the Baltimore County CPS report. (JA 200).

**D.** *Not Enough For A Search Warrant*

Sergeant Tompkins met with her team "and we knew based on everything that was given to us, we didn't have at that point enough for a search warrant." (JA 201-02; 235). Thompkins believed the child O would be at Thompson's residence that Saturday, but she denied having any sense of urgency. (JA 193; 263). The investigative plan was to obtain more information about Victim A's disclosure to develop the option to arrest Thompson. (JA 202). Sergeant Tompkins decided that Detective Avelar should go to Baltimore County in the morning of March 17th to review a recording of Victim A's past disclosure to CPS and interview the mother. (JA 202). Sergeant Tompkins anticipated, however, that the mother of O and Victim A would alert Thompson once Detective Avelar brought her in for an interview on March 17th. (JA 263). Sergeant Tompkins believed "[i]t was more important for [Detective Avelar] to get eyes on the video. And if we could get another interview, get an interview with the child or get an interview with the mother if we could since he was lead investigator. So then from there, I would do the search warrant and take it and get it signed." (JA 207-08).

While Sergeant Tompkins was developing an option to arrest Thompson, she had Detective Avelar call Individual 1 back. (JA 203). Sergeant Tompkins explained the purpose of the follow-up call to Individual 1 was to try to obtain further information in support of a search warrant, and "... to try to corroborate her statement

28

because we also knew that the judge would want that corroboration in that search warrant." (JA 235). Sergeant Tompkins was also interested in corroboration of the details about Victim A's disclosure to determine if there was probable cause for a felony arrest of Thompson. (JA 202-03). Sergeant Tompkins listened to the follow-up call over the speakerphone and wrote some questions on "stickee" notes for Detective Avelar to ask Individual 1. (JA 203-04; 227). Sergeant Tompkins did not keep a record of the questions because as a supervisor, "we don't take notes." (JA 225). Phone records showed the call lasted seven minutes. (JA 237-38).

No new information was obtained related to the search warrant during the phone call. Sergeant Tompkins recalled that Individual 1 "[b]asically, she kind of recited it again." (JA 204). Instead, Sergeant Tompkins confirmed that Individual 1 did not know specific details or dates, such as Victim A's age, beyond the information she provided earlier to Detective Avelar. (JA 204-05). Sergeant Tompkins did not write anything down from the follow-up call because she has "a pretty good memory when it comes to stuff like that." (JA 240). After the call ended, the team met again, and Sergeant Tompkins told Detective Avelar to work on the search warrant that night and plan to go to Baltimore County in the morning to review the recorded interview of Victim A. (JA 206).  Sergeant Tompkins believed that she did not have enough information for a search warrant and wanted to wait until after Detective Avelar reviewed the interview of Victim A. (JA 245).

### E.    *Sergeant Tompkins Adds Information Late To The Affidavit*

Detective Avelar drafted the affidavit and emailed it to Sergeant Tompkins, who reviewed it early Friday morning, March 17th. (JA 243-44). The affidavit set forth the information Sergeant Tompkins had already concluded was insufficient to secure approval for a search warrant. (JA 245). Meanwhile, Detective Avelar and another detective drove to Baltimore County to watch the video of Victim A's past disclosure to CPS. While Detective Avelar was in Baltimore County, Sergeant Tompkins began to edit the affidavit, and, add new information. Sergeant Tompkins recounted that her edits and additions of new information to the affidavit were considered and deliberate. (JA 208). She made changes only after she spoke or texted with Detective Avelar who was in Baltimore County. (JA 256-57). Sergeant Tompkins related that she was "talking to [Detective Avelar] the whole time" that she was making edits to the warrant. (JA 261).

The new information, however, consisted of Sergeant Tompkins' inferences or beliefs that Thompson abused Victim A at Ballinger Terrace, but presented in a factual narrative, attributed to Individual 1, that Victim A had disclosed to Individual 1 that "that the abuse happened when her and her mother went to 'Kyle's house' located at 14215 Bellinger Terrace, Burtonsville, Montgomery County, MD." (JA 219). Sergeant Tompkins understood the significance of the new information about Individual 1 added late to the affidavit:

Q       But you know that the version of the warrant that you got at 1:40
        a.m. did not attribute the statement that [Victim A] disclosed that
        the abuse occurred at Kyle's house to [Individual 1]?
A       Yes.
Q       You added to that search warrant that [Individual 1] had said that
        [Victim A] disclosed the abuse took place at Kyle's house?
A       Yes.
Q       The same way you added to the search warrant that [Individual
        1] disclosed that the child's mother had lied regarding not
        knowing about the name and where about of the location of
        where the abuse occurred?
A       That is correct.
Q       And you know as you are reviewing the warrant and making
        edits, you know the importance between the – I mean you know
        the importance about the nexus between the location where the
        place is to be searched and the object of the search?
A       Yes.
Q       And you know the importance of corroborating information that
        supports the basis of the search warrant?
A       Correct.

(JA 245).

## F.    *Sergeant Tompkins Switches The Affiants*

Detective Avelar remained in Baltimore County throughout Friday morning,
March 17th. Sergeant Tompkins wanted to execute the search warrant before
Saturday. At 12:15 p.m. on March 17th, Sergeant Tompkins emailed a state
prosecutor that she had switched affiants. (JA 250). Sergeant Tompkins did not,
however, change Detective Avelar's statement, "the writer interviewed [Individual
1]...." (JA 259). Sergeant Tompkins understood that this statement described
Detective Avelar's and Sear's interview of Individual 1. (JA 212). Nevertheless,
Sergeant Tompkins believed that, because she overheard the follow-up phone call

31

with Individual 1, and suggested questions for Detective Avelar to ask, the statement, "the writer interviewed [Individual 1]" was accurate. (JA 213). Sergeant Tompkins stated that she believed all of her sworn statements in the March 17th affidavit were similarly accurate. (JA 217-21). Judge Rubin signed the search warrant for Ballinger Terrace around 1:30 p.m. on March 17, 2017. (JA 252).

### G. *The Lower Court Misconstrued The Standard For Deliberate Indifference*

At the conclusion of the *Franks* hearing, the lower court summarized its rationale for conducting the *Franks* hearing:

> The focus I had raised was these attributions to the anonymous source, perhaps not any one individually, but whether collectively, the multiple references to the anonymous source if they were inaccurately attributed, whether those could be necessary to the determination at least in terms of showing that a significant amount of information came from the anonymous source, not that any one statement was perhaps necessary. And so I think it was a close call. But I felt like in the abundance of caution, it was appropriate to have the hearing just to clear -- get a clear statement of what the situation was at the time.

(JA 283-84). The court concluded:

> [W]hen you are doing a Franks hearing, the starting point is the affiant. And in most cases, that is the end point. If I were to have gotten the impression in any way that there was a misstatement or that there was intentional falsehood or there was a basis to think that we needed to have further corroboration or possible contradiction of her statements, then I would consider whether we should have additional testimony or evidence. As we've heard, there can be no end to it.
>
> But in this instance, I heard the testimony of Sergeant Tompkins or Lieutenant Tompkins. I found it to be credible and thorough on points which I'll elaborate on. So I am not going to re-open the record or

32

extend the record to include additional witnesses. I don't think that's necessary for reasons that I will state.

(JA 284).   The error of the lower court was to treat this *Franks* hearing as a straightforward credibility assessment of Sergeant Tompkins about the accuracy of her conclusions. Without question, Sergeant Tompkins believed her conclusions to be accurate. In fact, with the aid of hindsight, her ultimate conclusions were correct. However, [i]n law it is good or bad when it starts and does not change character from its success." *U.S. v. Di Re*, 332 U.S. 581, 595 (1948). The problem *ex ante* here is that, by not disclosing that she had drawn inferences or conclusions from the investigation, and instead attributing information to Individual 1 that bolstered a reliability assessment, Sergeant Tompkins hindered the ability of the issuing judge to independently evaluate the factual basis for probable cause. A judge cannot be viewed as neutral and detached if the judge issues a search warrant that is unknowingly based on a detective's conclusions.  *People v. Caffott*, 164 Cal.Rptr. 499, (1st Dist. Cal. 1980) (inferences should be left to magistrate). For this reason, Fourth Amendment doctrine encourages officers to communicate and disclose the basis of information to the issuing judge. *Whiteley v. Warden*, 401 U.S. 560 (1971) (magistrate may rely on general rule of police officer veracity when *affiant discloses* another officer is the source of information).

A neutral magistrate's independent assessment of probable cause is crucial to the operation of the Fourth Amendment. *Franks*, 438 U.S. 154, recognized "the

obvious assumption" that the Fourth Amendment warrant requirement demands "'a *truthful* showing'" by the affiant of probable cause. *Id.* at 164-65 (quoting *United States v. Halsey*, 257 F.Supp. 1002, 1005 (S.D.N.Y. 1966) (emphasis in original)). *Franks* stated, "[b]ecause it is the magistrate who must determine independently whether there is probable cause, it would be an unthinkable imposition upon his authority if a warrant affidavit, revealed after the fact to contain a deliberately or reckless false statement, were to stand beyond impeachment." *Franks*, 438 U.S. at 165. This Court discussed the meaning of "reckless disregard" in *Miller v. Prince George's County*, 475 F.3d 621 (4th Cir. 2007), explaining:

> "Reckless disregard" can be established by evidence that an officer acted "with a high degree of awareness of [a statement's] probable falsity," that is, "when viewing all the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported."

*Id.* at 627; *quoting Wilson v. Russo*, 212 F.3d 781, 788 (3d Cir. 2000); *see also, Forest v. Pawtucket Police Dept.*, 377 F.3d 52, 58 (1st Cir. 2004); *United States v. Clapp*, 46 F.3d 795, 801 n. 6 (8th Cir. 1995). The lower court's evaluation of Sergeant Tompkins' testimony was not faithful to the legal framework.

The sequence of events leading up to the issuance of the search warrant demonstrates that Sergeant Tompkins was very much aware that corroboration of the anonymous source's information was necessary. It is likewise indisputable that Sergeant Tompkins believed that she did not have probable cause until *after* she

attributed Victim A's disclosure of abuse at Ballinger Terrace to Individual 1. In that context, Sergeant Tompkins' late addition of her conclusion that Victim A was abused by Thompson at Ballinger Terrace, as information provided by Victim A to Individual 1, demonstrates the degree of indifference to the warrant process that comes within the limit of "reckless disregard." In this way, the source of information for Individual 1's knowledge was expanded to include Victim A and her mother, which could only bolster Individual 1's reliability to the issuing judge. From the perspective of the issuing judge, Individual 1 knows details from Victim A. As drafted, Sergeant Tompkins' statement "*[Individual 1] stated that* [Victim A] disclosed ..." indicated that *Individual 1* had a personal knowledge basis about Victim A's disclosure. Sergeant Tompkins further stated Individual 1's information could be corroborated:

> The writer conducted a check with Child Protective Services and other police agencies and could corroborate the information given by the source regarding [Victim A]. The writer found a sexual abuse report from Baltimore County Police dated October 9, 2015. The report stated [Child 2] was sexually abused by her mother's boyfriend "Kyle."

(JA 118). Realistically, the commonsense concern is that regardless of Sergeant Tompkins' *ex ante* belief that Thompson abused Victim A at Ballinger Terrace, relating her conclusion to the issuing judge as a disclosure made by Victim A to Individual 1 is unreasonable. *State v. Castagnola*, 46 N.E.3d 638 (Ohio 2015) (failure to disclose that fact was an inference drawn by detective usurps function of

35

issuing judge).  Because affidavits are to be read in a "commonsense and realistic" way, *United States v. Ventresca*, 380 U.S. 102, 108-09 (1965), an affiant's conclusions or inferences should not be presented as facts.  This demonstrates Sergeant Tompkins' disregard for the role of the issuing judge and the unreasonableness of the warrant.

### H.    *The Court Erred In Finding Leon Good Faith*

Sergeant Tompkins attributed a basis of knowledge to Individual 1 late in the search warrant process that a reasonable officer would know are material to the judge finding probable cause. The lower court's good faith ruling under *Leon*, 488 U.S. 897, was in error because as *Leon* makes clear, Sergeant Tompkins was not acting reasonably when she presented her conclusion or inference about Victim A at Ballinger Terrace as a disclosure by Victim A to Individual 1.  "Unquestionably, a police officer attempting to convince a judge to issue a warrant is aware that certain words sound better and are cloaked with more reliability than others." *West v. State*, 137 Md. App. 314 (2001). Sergeant Tompkins could not, therefore, objectively rely in good faith on the validity of the March 17th search warrant for Ballinger Terrace. A reasonable police officer would know that the reviewing judge may scrutinize inferences and conclusions more closely than a source's direct knowledge of a child's disclosure. *See*, *e.g.*, *Bennett v. City of Grand Prairie*, 883 F.2d 400, 407 (5th Cir. 1989) (an affiant who merely relates the information of other officers "invites

increased judicial scrutiny[] of the affidavit"); *see, e.g., United States v. Williams*, 548 F.3d 311, 317 (4th Cir. 2008) (a reasonable officer cannot rely on a warrant issued in reliance on false statements contained in a search warrant affidavit).

If there is any question about the significance of Sergeant Tompkins' attribution of Individual 1's source of knowledge, the government's arguments at the original suppression hearing dispel any doubt. As to the critical nexus to Ballinger Terrace, the government argued:

> So – and, again, this was linking, and I repeat, or I will read it again, ***The anonymous source stated that Victim 2 disclosed that the abuse happened when her and her mother went to Kyle's house***. Again, this is information -- which ***she then stated was the Ballinger Terrace address***.

(JA 61) (emphasis supplied). Moreover, as this Court stated in *United States v. Thomas*, 908 F.3d 68 (4th 2018), the "central question" is whether the Court can look beyond the four corners of the affidavit in applying *Leon*, "and consider as well facts known to [the affiant] but omitted from the affidavit presented to the magistrate." *Id.*, at 73. *Thomas* reinforced that, "[u]nder *McKenzie-Gude* '*Leon* presents no barrier' to considering 'uncontroverted facts' known to an officer but 'inadvertently not presented to the magistrate' in assessing the officer's objective good faith." *Thomas*, 908 F.3d at 73 (quoting *McKenzie-Gude*, 671 F.3d at 460. Here, the government did not present any testimony that "uncontroverted facts" known to Sergeant Tompkins were "inadvertently not presented to the magistrate." (JA 292).

Accordingly, the court below erred when it sustained its ruling under *Leon.*

**4.    CONCLUSION**

For the reasons stated above, the judgment of the court below should be reversed.

## REQUEST FOR ORAL ARGUMENT

In *United States v. Palomino-Coronado*, 805 F.3d 127, 131 (4th Cir. 2015), the Court did not reach the question of the proper instruction for the *mens rea* element for a § 2251(a) conviction. To be sure, this case involves a challenging set of facts involving multiple purposes related to the sexual abuse of a minor. The legal issue, however, cuts across every case where a person is charged with violating § 2251(a): what is the *mens rea* requirement? The answer to this question and the important issues it touches upon should be more fully developed through oral argument, and respectfully request the same.

Respectfully submitted,

RaquinMercer LLC

By:    /s/ Stephen Mercer
Stephen Mercer, #12855
5906 Hubbard Drive
Rockville, Maryland 20852
Tel:    (301) 880-9250
Fax:    (833) 816-5605
Email: Steve@RaquinMercer.com

*Attorney for Kyle Stephen Thompson*

# CERTIFICATE OF COMPLIANCE

1.      This brief complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

[ X ] this brief contains [10,008] words.

[    ] this brief uses a monospaced type and contains [*state the number of*] lines of text.

2.      This brief document complies with the typeface and type style requirements because:

[ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 2016*] in [*14pt Times New Roman*]; *or*

[    ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

Dated:  July 2, 2019                        /s/ Stephen Mercer
                                                          *Counsel for Appellant*

# CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 2nd day of July, 2019, I caused this Brief of Appellant and Joint Appendix to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to all counsel of record as registered CM/ECF users.

/s/ Stephen Mercer
*Counsel for Appellant*